Filed 1/25/24  P. v. Valladares CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE, | D080955 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN433660) |
| VALENTIN VALLADARES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Valentin Valladares (appellant) appeals his July 2022 convictions for stalking (Pen. Code,[1] § 646.9, subd. (b); count 1), intimidating a witness (§ 136.1, subd. (a)(1); count 2),[2] three counts of violating a court order (§ 166, subd. (c)(1); counts 3, 5, & 7), disobeying a family court order (§ 273.6, subd. (a); count 4), and battery on a significant other (§ 243, subd. (e)(1); count 6). Defendant argues: (1) his attorney violated his Sixth Amendment rights by conceding guilt as to four of seven counts; (2) substantial evidence did not support the conviction for intimidating a witness; and (3) the court erred by giving a "flight" instruction which permitted the jury to infer appellant's awareness of his guilt if it determined he fled the scene. We reject these contentions and affirm the trial court.

During our record review we discovered a discrepancy between the amended information[3] and the verdict form for count 2 (witness intimidation). Both specify the defendant is charged with dissuading a witness from testifying, in violation of section 136.1, subdivision (a)(1) (section 136.1(a)(1)). However, the jury instructions and the attorneys'

---

[1] Further undesignated statutory references are to the Penal Code.

[2] But see discussion, *post*.

[3] Filed July 25, 2022.

closing arguments addressed a violation of section 136.1, subdivision (a)(2) (section 136.1(a)(2)) for *attempting* to dissuade a witness from testifying.[4]

We requested and received supplemental briefing from the parties regarding the effect of this apparent error. The People responded that appellant forfeited any objection given his agreement with the pre- and post-trial jury instructions, and if appellant did not forfeit his objection, then discussions regarding the evidence during trial and the jury instruction afterwards gave appellant notice of the actual charge in dispute. Appellant argued the court failed to instruct on attempt (see CALCRIM No. 460), an element of the crime, rendering the instructions fatally flawed.

For reasons explained below, we find appellant was not prejudiced by any instructional error. Further, we reject appellant's other contentions and affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellant and his former domestic partner, C.C.,[5] were in a relationship between 2017 and 2021; the two share a young child. Their relationship involved periodic violence towards each other. In October 2020, appellant pleaded guilty to battery in connection with one of these instances. As part of that conviction, the superior court issued a criminal protective

---

[4] Section 136.1, subdivision (a) states in relevant part: "[A]ny person who does any of the following is guilty of a public offense . . . . [¶] (1) Knowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law. [¶] (2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law."

[5] Pursuant to California Rules of Court, rule 8.90(b)(4), we use initials to protect the victim's identity.

order (CPO) pursuant to section 1203.097, prohibiting appellant from "harass[ing], strik[ing], threaten[ing], assault[ing] . . . , follow[ing], stalk[ing], [or] molest[ing]" C.C., as well as "destroy[ing] or damag[ing] personal or real property, disturb[ing] the peace, keep[ing] under surveillance, or block[ing] movements of" C.C. The order, effective through October 2023, reflects appellant "was personally served with a copy . . . at the court hearing."

On March 14, 2021, appellant and C.C. attended a concert together. At the trial in this case, C.C. testified that the two fought and "were cussing at each other and hitting each other." C.C. testified appellant hit her, causing her to suffer a swollen lip. Appellant testified he never struck C.C., instead claiming she struck him, they argued, and then she jumped out of his car. Police were called, and they issued C.C. an emergency protective order against appellant.

On April 7, 2021, C.C. obtained a five-year domestic violence restraining order (DVRO) pursuant to Family Code section 6218. The DVRO required appellant to move out of their shared house. The order also prohibited appellant from coming within 100 yards of C.C., her home, and their child. And it proscribed "[c]ontact [with C.C.], either directly or indirectly, by any means, including, but not limited to, by telephone, mail, e-mail, or other electronic means." Appellant personally received the April 2021 DVRO on January 16, 2022, while in jail. The on-duty deputy sheriff read the order to appellant and provided him with a copy of the order. The order expires April 6, 2026.

On May 13, 2021, as part of additional charges brought in a new criminal case, the court entered a second CPO—this time pursuant to section 136.2. The new order prohibited appellant from making "personal, electronic, telephonic, or written contact" with C.C., even through a third

4

party, or coming within 100 yards of C.C. The order also reflects that appellant "was personally served with a copy . . . at the court hearing." It expires in May 2024.

On January 13, 2022, C.C. called 911, reporting that appellant was "being violent." C.C. testified that appellant woke her by pulling her blanket off and calling her "bitch" and "rat." Appellant admitted he spent the night at C.C.'s house, pulled the blanket off C.C., and argued with her. Although he denied calling C.C. a "bitch" on this occasion, he said he "probably called her b-i-t-c-h and . . . other words" when he was "upset." A responding deputy sheriff testified that C.C. said appellant "was accusing [C.C.] of being the reason for losing his job." According to the deputy, C.C. reported that appellant "threatened to slap her" and "mentioned something about having people to come after her." He arrested appellant for, among other things, violating a protective order.

On April 26, 2022, C.C. was scheduled to testify against appellant at a trial on charges of battery and violating a protective order. C.C. testified that early that morning, appellant repeatedly called her. She further testified that around 6:30 a.m. or 7:00 a.m., appellant showed up to her home and began "bang[ing]" on her window and woke her up. Appellant demanded that C.C. give him some of his clothes. C.C. said appellant called her names, including "bitch" and "snitch." Security footage played at trial showed appellant removing and taking C.C.'s doorbell camera.

C.C. testified that one of her neighbors called the police, but appellant departed before officers responded. Deputy Sheriff Jason Hayek testified that he arrived at C.C.'s home at approximately 7:00 a.m. and spoke to C.C. He viewed security footage of "[appellant] knocking on the window" and

5

taking C.C.'s camera; he confirmed that protective orders prevented contact by appellant. Deputy Hayek then gave C.C. a case number and left.

C.C. testified that shortly after Deputy Hayek departed the scene appellant returned "upset," once again calling her "bitch," and "snitch" and saying it was her fault he had "to deal with court." C.C. said she was outside when appellant returned, but once she saw him, she went inside and locked the door. According to C.C., appellant then called her a "rat" and said, "You know what happens to rats." She interpreted this to mean rats "get beat up." She further testified that appellant said, " 'You want me to break your shit?' or something like that" before breaking potted plants on C.C.'s patio. She said appellant then saw a police car, stated, " 'Oh. You called police,' " and again left. When asked if she believed "he left because he saw police driving by," C.C. responded, "Probably. That's what he said, huh? He also had to be at court so -- [.]"

Approximately 30 minutes later, C.C. called 911 and reported appellant "driving around out here again," and she wanted a deputy to come back so she "could get her kid in the car safely, get her somewhere safely." She told the 911 dispatcher, "I need to take care of my kids [sic] safety. Cause he knows that, that's how he is going to get to me, so I . . [sic] I don't want her in the picture at all. She's only three so I [sic] it's not like she can run and take off and, you know?"

Deputy Hayek testified that he and his partner returned to C.C.'s home a little after 9:00 a.m. He said he observed "broken pots strewn about in front of the residence," and C.C. "informed [him] that [appellant] had thrown them." Deputy Hayek's body-worn camera footage, which the jury saw, shows C.C. telling Deputy Hayek appellant called her a "rat because [she] call[s] the cops." She also told Deputy Hayek that appellant said, "you're a

6

f---ing rat and you know what happens." C.C. said she feared appellant was "going to do something to" their child "[b]ecause he knows he will get to [her] that way." In the footage, Deputy Hayek asks C.C. if she "think[s] [appellant] will use physical violence against" her, and she responds, "He might, he's hit me before but . . . like it [sic] hasn't like beaten me up. Like, like he's smacked me, that's his way." Deputy Hayek testified that, based on his experience interviewing victims, he "recognized her body language and her tone and how she was interacting with [Deputy Hayek] as someone consistent with being in fear."

C.C. did not appear in court after the confrontation that morning. When asked at the July 2022 trial why she did not testify against appellant at the April 26 trial, C.C. said, "I was upset. I wasn't -- I was already late taking our daughter and I -- I just -- If I took her still, I knew I was going to be frightened and not paying attention. It wasn't good for me."

The jury convicted appellant on all counts and found true the allegations. The court sentenced him to five years in state prison.

### III. DISCUSSION

*A. Counsel's Partial Concession of Guilt.*

In his closing argument, defense counsel conceded the evidence established appellant's guilt for misdemeanor protective order violations charged in counts 3, 4, 5, and 7. Appellant makes two contentions here. First, he argues that counsel's concessions violated his right to autonomy over the defense. (See *McCoy v. Louisiana* (2018) 584 U.S.__ [138 S.Ct. 1500] (*McCoy*).) Second, appellant asserts his attorney's concessions amounted to ineffective assistance of counsel under *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*). We disagree with both arguments. We see no evidence that appellant objected to counsel's strategy to concede guilt on

7

misdemeanor counts while contesting the felonies. Nor could we find in the record any instance in which appellant insisted on maintaining his innocence. As to ineffective assistance of counsel, as discussed below, the law does not support appellant's claims.

### 1. Standard of Review.

"We review the legal question of whether defendant's constitutional rights were violated de novo." (*People v. Palmer* (2020) 49 Cal.App.5th 268, 280.)

### 2. Right to Autonomy Over the Defense.

"[C]ertain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. . . . Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action." (*Florida v. Nixon* (2004) 543 U.S. 175, 187 (*Nixon*).) A defendant's right to determine the objective of his defense falls within this category. (*McCoy*, *supra*, 548 U.S. at p. __ [138 S.Ct. at p. 1507].)

In *McCoy*, defense counsel concluded the evidence against his client was overwhelming and that the defendant should concede guilt at the liability stage to avoid a death sentence. (*McCoy*, *supra*, 548 U.S. at p. __ [138 S.Ct. at p. 1506].) The defendant "was 'furious' when told" about this proposed strategy, explicitly communicating to counsel "not to make that concession." (*Ibid.*) Counsel "knew of [the defendant's] 'complet[e] oppos[ition] to [counsel] telling the jury that [he] was guilty of killing the three victims,' " and that the defendant only wanted to pursue acquittals. (*Ibid.*) Although defendant sought to terminate his counsel's representation, the court would not permit it, telling McCoy's attorney, " 'you have to make the trial decision of what you're going to proceed with.' " (*Ibid.*) In his

8

opening statement and in closing argument, defense counsel then conceded his client's guilt. (*Id.* at p. __ [138 S.Ct. at pp.1506–1507].) The Supreme Court concluded that once defendant made clear his wishes "to court and counsel, strenuously objecting to [counsel's] proposed strategy, a concession of guilt should have been off the table." (*Id.* at p. __ [138 S.Ct. at p. 1512].) The court held "that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." (*Id.* at p. __ [138 S.Ct. at p. 1505].) The court found "the error was structural" and ordered a new trial. (*Id.* at p. __ [138 S.Ct. at p. 1512].)

Appellant asks us to interpret *McCoy* to require an express on-the-record agreement to counsel's strategy.[6] Appellant cites no authority in support of his proposed extension to the *McCoy* rule. Indeed, our decisions consistently hold *McCoy* only applies where the defendant actively and openly opposes counsel's concession. (See *People v. Villa* (2020) 55 Cal.App.5th 1042, 1056 [*McCoy* did not apply because defendant had not "shown he opposed [counsel's] concessions"]; *In re Smith* (2020) 49 Cal.App.5th 377, 388 ["*McCoy* makes clear . . . that for a Sixth Amendment violation to lie, a defendant must make his intention to maintain innocence clear to his counsel, and counsel must override that objective by conceding guilt"]; *People v. Burns* (2019) 38 Cal.App.5th 776, 784, ["*McCoy* is . . . predicated on a client's express objection to defense counsel's concession strategy"]; *People v. Franks* (2019) 35 Cal.App.5th 883, 891 [*McCoy* did not

---

6    Appellant argues, in the alternative, "At a minimum, under *Nixon*, appellant should, at least, have been given the opportunity to object to counsel's argument prior to the argument being presented to the jury." We do not see *Nixon* reaching that far. *Nixon* concerned the right to effective assistance of counsel, an issue discussed, *post*. (See *Nixon*, *supra*, 543 U.S. at p. 192.)

9

apply where "nothing in the record indicate[d] that [defendant] ever made it clear to his counsel (or the court) that the objective of his defense was to maintain innocence, or that he voiced 'intransigent objection'—or any opposition—to his lawyer's defense strategy"]; *People v. Lopez* (2019) 31 Cal.App.5th 55, 66 [declining to extend *McCoy* to circumstances in which "the defendant has not expressly raised an objection"].)  Even prior to *McCoy*, our own Supreme Court held, "It is not the trial court's duty to inquire whether the defendant agrees with his counsel's decision to make a concession, at least where, as here, there is no explicit indication the defendant disagrees with his attorney's tactical approach to presenting the defense."  (*People v. Cain* (1995) 10 Cal.4th 1, 30.)

We similarly decline to extend *McCoy* to require a defendant's on-the-record acquiescence to counsel's strategy of conceding guilt.  Unlike in *McCoy*, neither appellant nor his counsel made any statement to the trial court reflecting that appellant wished to maintain his innocence as to counts 3, 4, 5, and 7.  Moreover, after the court empaneled the jury, appellant asked his counsel to "present the people with an offer to resolve this case," and then asked for the court's likely sentence if he were to plead guilty.  Further, appellant testified on his own behalf (against the advice of his counsel), admitting to the vast majority of the conduct supporting the charges.  This does not reflect the kind of intransigent opposition to conceding guilt presented in *McCoy*.

Appellant contends that he insisted on his innocence when he testified, denying that he ever received any of the protective orders.  However, in his trial testimony, appellant ultimately conceded that law enforcement served him with the orders or that he otherwise knew each one existed.  Specifically, appellant conceded he appeared in court on October 22, 2020, which is when

10

the court issued the October 2020 CPO. Appellant then conditionally admitted he was present for the issuance of the May 2021 CPO, "[i]f a certified court document" reflected that. Both the May 2021 CPO and the October 2020 CPO are certified court documents showing that appellant appeared in court and was served with a copy of the orders. This means appellant implicitly conceded service of both the May 2021 CPO (at issue in counts 3 & 5) and the October 2020 CPO (at issue in count 7). Appellant also admitted he moved out of C.C.'s home because of the April 2021 DVRO (at issue in count 4) and agreed he "was aware that there was a protective order in place between January and April" 2022. Indeed, he testified that the court told him he could not go to C.C.'s home to retrieve his clothes because he would "be violating the restraining order." These examples reflect that rather than insisting on his innocence, appellant conceded his guilt.

Appellant also claims his prior disagreements with counsel render *McCoy* applicable. However, the transcripts of two *Marsden*[7] hearings reflect disagreements on other issues, but not appellant's desire to assert his factual innocence or counsel's plan to concede guilt to some charges. Based on the record before us, we conclude that appellant failed to demonstrate his attorney's concessions about appellant's guilt to certain charges violated appellant's Sixth Amendment right to autonomy over the defense.

### 3. *Ineffective Assistance of Counsel.*

Appellant next argues that his attorney's concession deprived appellant of effective assistance of counsel. To establish an ineffective-assistance-of-counsel claim under *Strickland*, appellant must "show that counsel's performance was deficient" and demonstrate "that the deficient performance prejudiced the defense." (*Strickland, supra*, 466 U.S. at p. 687.) As to

---

[7] *People v. Marsden* (1970) 2 Cal.3d 118.

11

deficient performance, appellant "must show that counsel's representation fell below an objective standard of reasonableness." (*Id.* at p. 688.)

Appellant argues "there are no reasons founded in trial tactics that defense counsel did not request a waiver from appellant before admitting his guilt before the jury." But the Supreme Court previously rejected the contention that a client must always expressly agree to a strategic concession of guilt. (*Nixon, supra,* 543 U.S. at p. 192 ["When counsel informs the defendant of the strategy counsel believe[d] to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding defendant's explicit consent"].) And this record is devoid of any reference as to whether appellant's attorney obtained a waiver. We decline to speculate either way.

In reliance on North Carolina cases pre-dating *McCoy* and *Nixon,*[8] appellant argues "if counsel admits the defendant's guilt without first obtaining consent, it is per se ineffective assistance of counsel because counsel's admission deprives the defendant of the right to have his or her guilt or innocence determined by the jury." However, *Nixon* squarely rejected a per se standard, holding that counsel's strategic concessions are subject to the general *Strickland* rule. (See *Nixon, supra,* 543 U.S. at p. 192.) Under the circumstances of this case, particularly in light of appellant's trial testimony, defense counsel's concession during closing argument does not fall below an objective standard of reasonableness, and therefore, appellant does not satisfy the first *Strickland* prong. Our finding that the attorney's performance was not deficient means we do not reach *Strickland*'s second prong. Appellant's ineffective assistance of counsel claim fails.

---

8    *State v. Thomas* (1990) 327 N.C. 630 [397 S.E.2d 79]; *State v. Har*bison (1985) 315 N.C. 175 [337 S.E.2d 504]; and *State v. Perez* (1999) 135 N.C.App. 543 [522 S.E.2d 102].

*B. Intimidating A Witness—Count 2.*

Appellant challenges his conviction for violation of section 136.1, claiming there was insufficient evidence for the jury to find that he attempted to prevent or dissuade a witness from testifying with force or the threat of force. Sua sponte, we raised discrepancies in the trial record concerning this count. We address that issue first.

*1. Discrepancies Regarding the Offense.*

*a. Additional Background.*

The prosecution charged appellant with violating section 136.1(a)(1). (See footnote 4, *ante*.) The People did not amend this count prior to the court submitting the case to the jury. (See § 1009; *People v. Graff* (2009) 170 Cal.App.4th 345, 361 ["The court may allow amendment of the accusatory pleading to correct or make more specific the factual allegations of the offense charged at any stage of the proceeding, up to and including the close of trial, if there would be no prejudice to the defendant"].) However, the court pre-instructed the jury with the "attempt" offense described in section 136.1(a)(2),[9] instead of the instruction for the completed offense described in section 136.1(a)(1).[10] Appellant did not object to this

---

[9] The jury was instructed on this offense as follows: "The defendant is charged in Count 2 with intimidating a witness, in violation of Penal Code section 136.1. To prove that the defendant is guilty of this crime, the people must prove that . . . the defendant maliciously tried to prevent or discourage [C.C.] from attending or giving testimony at a jury trial . . . . [¶] A person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way or intends to interfere in any way with the orderly administration of justice. . . . It is not a defense that the defendant was not successful in preventing or discouraging the victim, and it's not a defense that no one was actually physically injured or otherwise intimidated."

[10] An instruction under that subdivision would have been as follows:

13

instruction.

Indeed, during the post-trial jury instruction conference the court asked if either side objected to using CALCRIM No. 2622 for count 2:

> "THE COURT:  And we have 2622.  I didn't see any changes to make to that.  Any objection to that?  2622?
>
> "[DEFENSE COUNSEL]:  No, sir.  Is it the 136.1(b) or --
>
> "THE COURT:  It's -- well, it should be --
>
> "[DEFENSE COUNSEL]:  Is it 136.1(a)(1)?  Just to make sure it's the right one.  It is the same instruction.
>
> "[PROSECUTOR]:  I'll change that to - (a)(1).
>
> "THE COURT:  Just the title.
>
> "[DEFENSE COUNSEL]:  I think other than that, that looks identical to the CALCRIM.
>
> "THE COURT:  Okay.  Perfect."

During that same colloquy, the court raised potential lesser included offenses:

> "THE COURT:  Okay.  Then, for count 2, the 136.1(a)(1), with the 136.1(c)(1) allegation, that makes it a felony.  The lesser included offense [(L.I.O.)] would be 136.1(a)(1), so I

---

"The defendant is charged in Count 2 with intimidating a witness, in violation of Penal Code section 136.1. [¶] To prove that the defendant is guilty of this crime, the people must prove that . . . [¶] [t]he defendant maliciously *prevented or discouraged* C.C. from attending or giving testimony at a jury trial. . . . [¶] A person acts *maliciously* when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in anyway with the orderly administration of justice."  (CALCRIM No. 2622 [Alternative 1A, modified with case specifics]; first italics added.)  The instruction would not have included the proviso that "[i]t is not a defense that the defendant was not successful in preventing or discouraging the victim."

14

don't think there's anything that would be considered an L.I.O. Do you both agree with that?

"[DEFENSE COUNSEL]: Yes, your honor.

"[PROSECUTOR]: Yes, your Honor. The only thing that I believe is an L.I.O. is an attempt, below that.

"THE COURT: An attempt -- right. There either was a 136.1 or there wasn't. Do you both agree with that? There's no evidence which would suggest an attempt rather than the completed act.

"[DEFENSE COUNSEL]: Yes.

"[PROSECUTOR]: Yes.

"[DEFENSE COUNSEL]: I'd rather just have the completed act than the attempt, because I think it changes the mental state.

"THE COURT: All right. . . ."

Although it did not mention a particular subdivision, the court ultimately instructed the jury using "attempt" language consistent with section 136.1(a)(2).[11] Consistent with this instruction, both the prosecution and the defense closing arguments stated that appellant was guilty of count 2 if he *tried* to dissuade or prevent C.C. from testifying. The prosecution argued, "Now, I want to be clear. I mentioned that she actually didn't come. She was dissuaded from coming to court on April 26, but I don't have to prove that she was actually dissuaded. . . . It's not a defense that the defendant

_____

[11]    We make two observations. First, for section 136.1(a)(2) CALCRIM No. 2622 does not use the word "attempt" but instead employs "tried to" in an effort to capture the meaning of section 136.1(a)(2). Second, the instruction is not formatted in a way that makes it easy for lawyers or judges to select the correct options. We do not fault the judge or the lawyers here.

15

was not successful in preventing or discouraging the victim." Similarly, defense counsel argued:

> "[The] People have to prove . . . that he maliciously tried to prevent or discourage [C.C.] from going to court or giving testimony at the jury trial that she was a crime victim. . . . Again, I put the things in red that I think are important to remember. 'Maliciously tried to prevent her or discourage her from giving a report or testimony or attending court,' right?"

The jury found appellant guilty on count 2, and both the verdict form and the oral pronouncement specified that he was convicted of violating section 136.1(a)(1). The abstract of judgment also reflects the jury convicted appellant under section 136.1(a)(1), not section 136.1(a)(2).

### b. *The Parties' Responses.*

We requested, and the parties submitted, simultaneous supplemental briefs on this issue. The People argue that all citations in the trial court to section 136.1(a)(1) were erroneous and that "the parties litigated the case with the understanding that the crime being alleged fell under subdivision (a)(2), and the jury was instructed as such." The People state that the colloquy regarding lesser included offenses and attempt reflects that "the parties expressly agreed that there was no substantial evidence appellant merely committed an attempted violation of the statute, because the statute incorporated the attempted crime, and thus it would be inappropriate to separately instruct on attempt." The People contend that this court can disregard the "technical error[s]" below and should order the trial court to amend the abstract of judgment to reflect a conviction under section 136.1(a)(2), rather than section 136.1(a)(1).

Appellant argues that the trial court erred by failing to give a more detailed instruction regarding attempt, specifically CALCRIM No. 460.

16

Appellant contends that this amounts to a "[f]ailure to instruct the jury on all essential elements of the charged offense" and that this court must remand "for a new trial with a properly instructed jury."

### c. Standard of Review.

The inconsistencies between the amended information, the verdict form, and the indictment raise legal issues that we review de novo. (See, e.g., *People v. Butler* (2003) 31 Cal.4th 1119, 1127.)

### d. Analysis.

First, we note that the semantic difference between the instruction as given ("the people must prove that . . . the defendant maliciously tried to prevent or discourage [C.C.]" [as shown in footnote 9]) and the instruction that should have been given ("the people must prove that . . . [t]he defendant maliciously prevented or discouraged C.C." [as shown in footnote 10]) is vanishingly small. A reasonable person would have difficulty distinguishing between "trying to discourage" someone and "discouraging" someone, and it is likely that the two terms could be used interchangeably in normal conversation.

Nonetheless, we conclude that the repeated and consistent references to section 136.1(a)(1) are not mere "technical error[s]." Section 136.1(a)(2) is not mentioned anywhere in the record, while section 136.1(a)(1) appears in the amended information filed days before trial, the prosecution's trial brief, the parties' discussion with the court, the jury's verdict, and the abstract of judgment. Unlike the People, we think the colloquy regarding lesser included offenses and "attempt" confuses rather than clarifies the issue, especially considering defense counsel's stated preference for "the completed act."

Nonetheless, as explained below, the jury had the authority to convict appellant of attempt and the record clearly reflects that intention. Given

17

that appellant never objected to the discrepancies, and there is no prejudice to his substantial rights, we conclude there is no basis to reverse the conviction.

"' "A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court." ' " (*People v. Jones* (1997) 58 Cal.App.4th 693, 710.) " '[T]he form of the verdict generally is immaterial, so long as the intention of the jury to convict clearly may be seen.' " (*People v. Jackson* (2014) 58 Cal.4th 724, 750 (*Jackson*).) The jury was only instructed on the attempt offense described in section 136.1(a)(2), not section 136.1(a)(1). Similarly, both sides argued in closing that appellant needed only to attempt to dissuade C.C. In such circumstances, we can only conclude that the jury intended to convict appellant of section 136.1(a)(2).

In *Jackson*, *supra*, 58 Cal.4th at page 750, the Supreme Court affirmed a conviction under similar circumstances. There "[t]he information, which was read to the jury, alleged that defendant had committed murder while engaged in the commission or attempted commission of the crime of robbery[, and] [t]he jury received instructions on the elements of robbery and the elements of attempt." (*Id.* at p. 749.) The jury received a murder instruction that referenced both commission and attempted commission of robbery. (*Id.* at p. 750.) In addition, the prosecution conceded in closing arguments that it was " 'at best . . . murky whether [defendants] got dope or money from that house,' " but "emphasized . . . that an attempted robbery was sufficient to support the charges." (*Ibid.*) The verdict form, however, "show[ed] the jury expressly found true only that the murder was committed while defendant 'was engaged in the commission of the crime of ROBBERY.' " (*Ibid.*) Nonetheless, the Supreme Court held that "[t]he verdict form's failure

18

to reference an attempted commission of robbery did not serve to limit the charges against defendant," and "the jury's return of that form [did not] restrict its finding to one of a completed robbery." (*Ibid.*) The Court thus rejected the defendant's substantial evidence challenge to the murder conviction.

Here, the prosecution charged appellant with a completed act, not an attempt. However, a "jury . . . may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." (§ 1159.) Thus, "a defendant may be convicted of an attempt even if the People charged only the completed crime." (*People v. Fontenot* (2019) 8 Cal.5th 57, 61.) Although the People did not seek to amend the information to include a section 136.1(a)(2) charge, the jury was permitted to convict appellant of attempting the completed, charged offense. In addition, appellant knew that he could be convicted of the attempt offense given his acquiescence in the jury instruction and the express concession in defense counsel's closing argument. It would therefore unduly elevate form over substance to find reversible error simply because the information did not include section 136.1(a)(2) when that charge was the central focus for the parties as to count 2.

Furthermore, we cannot discern any conceivable prejudice to appellant's substantial rights. The difference between these provisions could not affect appellant's sentence. (See § 136.1, subds. (a), (c).) Appellant knew of the prosecution's attempt argument. No risk of jury confusion existed because the court instructed the jury only on section 136.1(a)(2). Until supplemental briefing, appellant did not raise the issue, either in the trial court or before us. Even his current objection is not to the charge itself, only that the court failed to include the CALCRIM attempt instruction. Nor does

appellant identify any cognizable error or prejudice.[12] We thus conclude there are no grounds to reverse this conviction.

### 2. *Substantial Evidence.*

Appellant claims the evidence presented at trial was insufficient to support a conviction for attempting to prevent or dissuade a witness from testifying with force or the threat of force. He first argues that the evidence does not establish he attempted to prevent or dissuade a witness from testifying. He then contends the evidence does not establish that he used or threatened force. Both arguments are unavailing.

### a. *Standard of Review.*

"In reviewing the sufficiency of the evidence to support a jury's verdict finding a defendant guilty of a criminal offense, we apply the substantial evidence standard of review." (*People v. Johnson* (2019) 32 Cal.App.5th 26, 57.) We "view[] the trial evidence in the light most favorable to the prosecution and presum[e] every fact the jury could reasonably deduce from that evidence . . . ." (*People v. Pearson* (2012) 53 Cal.4th 306, 319.) We " ' "must accept logical inferences that the jury might have drawn from the evidence even if [we] would have concluded otherwise." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 811–812.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination

_____

[12] Appellant argues there was instructional error, but we conclude that he forfeited the issue in light of his acquiescence to the instruction given by the court and his failure to request further instruction regarding attempt. (See, e.g., *People v. Cole* (2004) 33 Cal.4th 1158, 1211 ["Defendant did not ask the trial court to clarify or amplify the instruction. Thus, he may not complain on appeal that the instruction was incomplete"].)

depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) "Reversal . . . is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755.)

### b. *Section 136.1, Subdivision (a)(2).*

Section 136.1(a)(2) prohibits "[k]nowingly and maliciously attempt[ing] to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." " 'Malice' means an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." (§ 136, subd. (1).) "The circumstances in which the defendant's statement is made, not just the statement itself must be considered to determine whether the statement constitutes an attempt to dissuade a witness from testifying." (*People v. Wahidi* (2013) 222 Cal.App.4th 802, 806 (*Wahidi*).)

Substantial evidence supports appellant's conviction for witness intimidation. By appellant's own admission, after limited contact with C.C. for nearly four months, he arrived at C.C.'s house early on the morning she was scheduled to testify against him and insisted she let him inside the house. C.C. testified that appellant was specifically angry about her cooperation with law enforcement, calling her derogatory names and saying it was her fault that he had "to deal with court." C.C. told a sheriff that day, and confirmed in later trial testimony, that appellant called her a "snitch" and a "rat" and said, "You know what happens to rats." She understood a "rat" is someone who talks to police and rats "get beat up." She testified that appellant threatened to, and then actually did, break her potted plants. C.C.

21

said she did not end up going to court because she "was upset" and she "knew [she] was going to be frightened and not paying attention."

Appellant contends the evidence can only support his innocent explanation for appearing at C.C.'s house that morning:  He "only wanted to shower and get his clothes because of his court date."  The timing of appellant's appearance, his angry demeanor, and his express words support a reasonable inference that appellant intended to dissuade C.C. from testifying.  It is not determinative that a jury could also attribute an innocent explanation to his behavior.  (See *People v. Ford* (1983) 145 Cal.App.3d 985, 989 [language reasonably interpreted as a threat even though its "plain meaning" was arguably ambiguous].)

Appellant also maintains it is unreasonable to infer any intent to dissuade C.C. from testifying by calling her a "snitch" and a "rat" because he regularly called her those names before April 26.  However, according to C.C., appellant only started calling her a "rat" after she called the police in January 2020 following an argument.  This shows us that the epithet was directly tied to appellant's anger that C.C. was reporting his behavior to law enforcement.  C.C. also testified that appellant calling her a "snitch" and a "rat," "[m]aybe" dissuaded her from making statements to the police at first, bolstering the inference this was a desired effect.  In addition, there is no evidence that prior to the instant case appellant regularly told C.C. "[y]ou know what happens to rats."  The timing and nature of these insults and the addition of a thinly veiled threat amply support the jury's finding.

Appellant emphasizes that C.C. said she was not actually threatened by appellant's comments.  Section 136.1 does not require that C.C. subjectively experience fear.  Indeed, the crime can be completed without a threat.  (*Wahidi, supra*, 222 Cal.App.4th at pp. 804–805 [defendant who

22

asked witness to settle "and not take this to court" properly convicted under section 136.1 even though he "never demanded that [witness] refrain from testifying or threatened [witness] with harm if he were to come to court"].)[13] In any event, it is reasonable to conclude that C.C. was intimidated by appellant despite her assertions to the contrary. C.C. said she retreated into her home and locked the door when he showed up the second time. She reported to the 911 operator that she did not want to leave her house without an escort and that she was concerned for her child's safety. In addition, Deputy Hayek (who responded to her 911 call) testified that C.C. appeared fearful that day.

Finally, appellant argues he did not actually "impede[] [C.C.] or discourage[] her from testifying." But, as explained above (and as appellant concedes on appeal), he only needed to have attempted to dissuade C.C. from testifying. The People did not have to prove that he succeeded. Moreover, there was evidence that appellant's words and actions intimidated C.C. enough that she did not want to leave her home without law enforcement assistance. C.C. also testified that she did not show up in court to testify on April 26 at least in part because she "knew [she] was going to be frightened and not paying attention." In sum, substantial evidence supports the jury's verdict.

---

[13] Appellant cites cases that construe a very different statute and are inapposite. (See *In re George T.* (2004) 33 Cal.4th 620, 630–635 [defendant prosecuted under a "criminal threats" statute requiring the threat to be " 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat' " and cause the victim " 'to be in sustained fear for his or her own safety or for his or her immediate family's safety' "]; *People v. Wilson* (2010) 186 Cal.App.4th 789, 802 [same]; *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137 [same].)

*c. Section 136.1, Subdivision (c)(1) Enhancement.*

An offense under section 136.1 is "punishable by imprisonment in the state prison for two, three, or four years . . . [¶] [w]here the act is accompanied by force or by an express or implied threat of force or violence, upon a witness . . . or the property of any . . . witness." (§ 136.1, subd. (c)(1).) Appellant argues his actions were not accompanied by any "express or implied threat of force or violence." However, he used actual force on C.C.'s property by destroying some of her plant pots on his second visit. This evidence satisfies the felony enhancement clause, which applies when the intimidation "is accompanied by force . . . upon . . . the property of any . . . witness . . . ." (§ 136.1, subd. (c)(1).) Appellant's argument fails.

*C. "Defendant's Flight" Jury Instruction.*

Finally, appellant contends the trial court erred by including the CALCRIM No. 372 instruction:

> "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Appellant claims the instruction was misleading because the prosecution presented no evidence from which a jury could conclude he fled immediately after a crime was committed. We disagree.

*1. Standard of Review.*

"A claim of instructional error is reviewed de novo." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

*2. Analysis.*

" 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting

24

that his movement was motivated by a consciousness of guilt." ' [Citations.] Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.] To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328 (*Bonilla*).)

C.C. testified that on April 26, 2022, while appellant was at her house, he saw a police car, stated, " 'Oh. You called police,' " and left. When asked if she believed "he left because he saw police driving by," C.C. responded, "Probably. That's what he said, huh?" This evidence supports a reasonable inference that appellant fled the scene because he believed law enforcement officers were responding.

Appellant asserts that C.C. "answered the question based on the erroneous assumption that appellant had made a statement to police, telling them that was the reason he left." Appellant does not provide any citation to the record supporting this contention, and it is not in C.C.'s testimony.

Appellant also argues C.C. "was abruptly cut off in her answer by the prosecutor, leaving the jury with the misleading impression that appellant might have been trying to avoid the police." Although appellant contends there is a different inference to draw from this testimony, he concedes that the testimony does give the "impression that appellant might have been trying to avoid the police." A flight instruction is appropriate even if a juror "could attribute an innocent explanation to [the defendant's] conduct." (*Bonilla, supra*, 41 Cal.4th at p. 329.)

Finally, appellant contends "there is no evidence appellant left in a hasty manner or tried to hide from the police." Evidence of his demeanor is not required. Rather, "the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' " (*Bonilla, supra,* 41 Cal.4th at p. 328.) That requirement is met by the evidence of appellant's conduct here: He doggedly insisted on being let into C.C.'s home for clothes and a shower, then left, without either, after he saw a police car. (Cf. *id.* at p. 329 [flight instruction upheld where defendant left scene of an assault under circumstances that could have given rise to an inference of consciousness of guilt].)

## IV.  DISPOSITION

The trial court is directed to amend the abstract of judgment to reflect that the jury convicted appellant on count 2 under section 136.1(a)(2) and to send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


KELETY, J.

WE CONCUR:


O'ROURKE, Acting P. J.


CASTILLO, J.